[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-13739
_____

D.C. Docket No. 4:14-cv-00139-HLM

GEORGIACARRY.ORG, INC.,
DAVID JAMES,

                                        Plaintiffs - Appellants,

versus

THE U.S. ARMY CORPS OF ENGINEERS,
JON CHYTKA,
in his official Capacity as Commander,
Mobile District of the US Army Corps of Engineers,

                                        Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(June 9, 2015)

Before MARCUS, ROSENBAUM, and GINSBURG,[*] Circuit Judges.

MARCUS, Circuit Judge:

_____

[*] Honorable Douglas H. Ginsburg, United States Circuit Judge for the District of Columbia, sitting by designation.

This case involves a Second Amendment challenge to a federal regulation that bans loaded firearms and ammunition on property managed by the U.S. Army Corps of Engineers. The district court denied the plaintiffs' motion for a preliminary injunction in a thorough and thoughtful order. Before this Court, the plaintiffs hang their hats on a single, sweeping argument: that the regulation completely destroys their Second Amendment rights, thereby obviating the need for a traditional scrutiny analysis. We disagree. The regulation does not completely destroy the plaintiffs' right to bear arms because its effect is cabined to a limited geographic area designed for recreation. Whatever else the regulation does, it does not destroy the plaintiffs' Second Amendment right to keep and bear arms altogether. Thus, we affirm the district court's order and remand for further proceedings consistent with this opinion.

I.

The U.S. Army Corps of Engineers owns and manages various water resource development projects, such as dams and reservoirs, throughout the United States. These projects sometimes include recreational sites, such as parks and campgrounds, offered for public use. See 16 U.S.C. § 460d. The Corps prohibits the possession of loaded firearms or ammunition at any of these projects (except in designated hunting areas and shooting ranges) without the written permission of a district commander. The applicable federal regulation reads this way:

2

(a) The possession of loaded firearms, ammunition, loaded projectile firing devices, bows and arrows, crossbows, or other weapons is prohibited unless:

>   (1) In the possession of a Federal, state or local law enforcement officer;
>
>   (2) Being used for hunting or fishing as permitted under § 327.8, with devices being unloaded when transported to, from or between hunting and fishing sites;
>
>   (3) Being used at authorized shooting ranges; or
>
>   (4) Written permission has been received from the District Commander.

(b) Possession of explosives or explosive devices of any kind, including fireworks or other pyrotechnics, is prohibited unless written permission has been received from the District Commander.

36 C.F.R. § 327.13.  A violation of this ban is punishable by a $5,000 fine, six months' imprisonment, or both.  Id. § 327.25(a).

The plaintiffs, GeorgiaCarry.Org ("GCO") and David James, seek a preliminary injunction enjoining the enforcement of this regulation on the ground that it violates their Second Amendment rights.  GCO is a Georgia-based non-profit organization whose mission is to "foster the rights of its members to keep and bear arms."  James is a Georgia resident (and GCO member) who possesses a

3

Georgia weapons carry license[1] and regularly carries a handgun with him, where

permitted, in case of confrontation.

James frequently visits and camps at Allatoona Lake, a recreational site

managed by the Corps around the Allatoona Dam in northwest Georgia.  James

(and other members of the GCO) would like to carry their handguns with them

while they visit and camp at Allatoona and other Corps property.  In May 2014,

James requested written permission from defendant Jon Chytka, Commander of the

Mobile District of the Corps (which includes Allatoona), to carry a firearm at

Allatoona, pursuant to 36 C.F.R. § 327.13(a)(4).  On June 9, Commander Chytka

denied the request.

Three days later, the plaintiffs commenced this action in the United States

District Court for the Northern District of Georgia.  The plaintiffs maintain that the

application of the Corps' firearm prohibition against them violated the Second

Amendment, and seek a declaratory judgment as well as both preliminary and

permanent injunctions.  On August 18, the district court denied the plaintiffs'

motion for a preliminary injunction.  In determining whether the plaintiffs had

demonstrated a substantial likelihood of success on the merits, the court first held

that the restricted activity was not protected by the Second Amendment.  It

surveyed the history of the Corps and concluded that it was "[un]fathom[able] that

---

[1] Such a license is required under Georgia law to carry a handgun outside one's home, car, or
business.  See Ga. Code Ann. §§ 16-11-126, 16-11-129 (West 2015).

the framers of the Constitution would have recognized a civilian's right to carry firearms on property owned and operated by the United States military, especially when such property contained infrastructure projects central to our national security and well being." GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs (GeorgiaCarry.Org II), 38 F. Supp. 3d 1365, 1373 (N.D. Ga. 2014). The court noted that no appellate caselaw supported the plaintiffs. It reasoned that the regulation at issue fit within the Supreme Court's explicit carve-out in District of Columbia v. Heller, 554 U.S. 570, 626-27 (2008), for "laws forbidding the carrying of firearms in sensitive places," and observed that the Eleventh Circuit's post-Heller decision GeorgiaCarry.Org v. Georgia (GeorgiaCarry.Org I), 687 F.3d 1244 (11th Cir. 2012), supported the defendants insofar as it recognized the right of property owners (in this case, the federal government) to exclude firearms from their property. It then determined that the regulation at issue did not burden the plaintiffs' Second Amendment right to self-defense, as it did not regulate firearm possession within the home and did not effectively eliminate the ability to bear arms outside the home.

The finding that the regulated conduct fell outside the scope of the Second Amendment was fatal to the plaintiffs' motion. Nevertheless, "out of an abundance of caution" the district court went on to consider whether the regulation would withstand constitutional scrutiny if the Second Amendment were

5

implicated.  GeorgiaCarry.Org II, 38 F. Supp. 3d at 1376.  First, the court

determined that the regulation would be evaluated under intermediate -- not strict -

- scrutiny, because the Corps' regulation was merely "managerial action affecting

only government owned lands," it affected only "a finite amount of property . . .

that plaintiffs arguably [did not] need to use on a regular basis," and because the

plaintiffs' presence on the land was voluntary.  Id. at 1376-77.  The court then

determined that the regulation withstood intermediate scrutiny.  It reasoned that the

Corps had a substantial interest in providing safe recreational sites while protecting

its resources.  Relying on record evidence indicating that potentially violent

conflicts on Corps campgrounds were inevitable, it found that the firearm

regulation was a reasonable fit to the Corps' interests by contributing to visitor

safety and protecting infrastructure projects -- particularly in light of the Corps'

limited ability to police its own property.[2]  Thus, whether the conduct implicated

the Second Amendment or not, the court found no substantial likelihood of success

for the plaintiffs.

    The court also determined that the plaintiffs failed the remaining prongs of

the preliminary injunction standard.  It found no irreparable injury because the

plaintiffs had not shown a substantial likelihood of constitutional deprivation, and

---

[2] Corps Park Rangers may issue citations, but they are not authorized by Congress to carry firearms, execute search warrants, or make arrests.  See 16 U.S.C. § 460d; 36 C.F.R. § 327.25. As a result, the Corps must rely on cooperative agreements with local law enforcement agencies to provide increased patrols during peak visitation periods.

it found that the balance of harms and the public interest did not favor the plaintiffs

since an injunction could force the Corps to "remold the entire regulatory

framework governing recreation" at its facilities.  Id. at 1379.

The plaintiffs timely appealed.

## II.

We review the district court's denial of a preliminary injunction for abuse of

discretion.  Scott v. Roberts, 612 F.3d 1279, 1289 (11th Cir. 2010).  Findings of

fact are reviewed for clear error and legal conclusions are reviewed de novo.  Id.

"A party seeking a preliminary injunction bears the burden of establishing its

entitlement to relief."  Id.  To obtain such relief, the moving party must show: (1) a

substantial likelihood of success on the merits; (2) that it will suffer irreparable

injury unless the injunction is issued; (3) that the threatened injury outweighs

possible harm that the injunction may cause the opposing party; and (4) that the

injunction would not disserve the public interest.  Burk v. Augusta-Richmond

Cnty., 365 F.3d 1247, 1262-63 (11th Cir. 2004).  "[A] preliminary injunction is an

extraordinary and drastic remedy that should not be granted unless the movant

clearly carries its burden of persuasion on each of these prerequisites."  Suntrust

Bank v. Houghton Mifflin Co., 252 F.3d 1165, 1166 (11th Cir. 2001) (per curiam).

In analyzing a Second Amendment claim, this Court has followed a two-step

analysis: "first, we ask if the restricted activity is protected by the Second

Amendment in the first place; and then, if necessary, we . . . apply the appropriate level of scrutiny." GeorgiaCarry.Org I, 687 F.3d at 1260 n.34; accord Heller v. District of Columbia (Heller II), 670 F.3d 1244, 1252 (D.C. Cir. 2011); Ezell v. City of Chicago, 651 F.3d 684, 701-04 (7th Cir. 2011); United States v. Chester, 628 F.3d 673, 680 (4th Cir. 2010); United States v. Reese, 627 F.3d 792, 800-01 (10th Cir. 2010); United States v. Marzzarella, 614 F.3d 85, 89 (3d Cir. 2010).

III.

A.

We begin by asking whether the plaintiffs have established a substantial likelihood of success on their claim that the application[3] of the Corps firearms regulation violated their Second Amendment rights. The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court recently revolutionized Second Amendment jurisprudence in its landmark cases District of Columbia v. Heller, 554 U.S. 570 (2008), and McDonald v. City of Chicago, 561 U.S. 742 (2010). In Heller, the

---

[3] The plaintiffs characterize their challenge as both facial and as-applied, but we agree with the district court that it must be considered as-applied. See GeorgiaCarry.Org II, 38 F. Supp. 3d at 1371 n.3. The plaintiffs never explain why the regulation would be unconstitutional even if the district commander had granted permission to carry a weapon pursuant to 36 C.F.R. § 327.13(a)(4). Thus, as the district court explained, the "[p]laintiffs do not attempt to establish that no set of circumstances exists under which the [regulation] would be valid," as required for a facial challenge. Id. (quoting United States v. Salerno, 481 U.S. 739, 745 (1987)) (internal quotation marks omitted).

Court held for the first time that the Second Amendment "codified a pre-existing individual right to keep and bear arms," GeorgiaCarry.Org I, 687 F.3d at 1259 (quoting Heller, 554 U.S. at 592) (internal quotation marks omitted), for the "core lawful purpose of self-defense," Heller, 554 U.S. at 630, at least in the home, see id. at 628.  The Court identified the content of the Second Amendment right by examining the original public meaning of the Amendment's text and the understanding of the right to bear arms in the eighteenth and nineteenth centuries. Id. at 576-619.  But the Heller Court was careful to note that the Second Amendment right was "not unlimited."  Id. at 626.  In particular, the Court cautioned:

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

Id. at 626-27.  The Court identified this dictum as a non-exhaustive list of "presumptively lawful regulatory measures."  Id. at 627 n.26.

Having set out the basic contours of the Second Amendment right to bear arms, the Court struck down a District of Columbia firearm law that "totally ban[ned] handgun possession in the home" and "require[d] that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable."  Id. at 628.  The Court did not identify the applicable tier of

constitutional scrutiny, holding that the prohibition was so severe that it failed under any version of heightened scrutiny. See Heller, 554 U.S. at 628-29, 628 n.27. In finding that the ban "fail[ed] constitutional muster," the Court noted in particular that the D.C. ban extended "to the home, where the need for defense of self, family, and property is most acute." Id. at 628.

Two years later, in McDonald, the Court considered a challenge to a Chicago law that "effectively ban[ned] handgun possession by almost all private citizens who reside in the City." 561 U.S. at 750. The Court ruled that the Fourteenth Amendment incorporated the Second Amendment, making it applicable against the states, and remanded for further proceedings. Id. at 791. In so doing, the Court reiterated that "individual self-defense is the central component of the Second Amendment right," and that "citizens must be permitted to use handguns for the core lawful purpose of self-defense." Id. at 767-68 (alteration omitted) (quoting Heller, 554 U.S. at 599, 630) (internal quotation marks omitted).

This Court has ventured onto the terrain of post-Heller Second Amendment jurisprudence on three notable occasions. In United States v. White, 593 F.3d 1199 (11th Cir. 2010), we upheld against Second Amendment challenge the federal prohibition on the possession of firearms by persons convicted of the misdemeanor crime of domestic violence, 18 U.S.C. § 922(g)(9). We noted that the Heller Court had specifically identified the federal prohibition on the possession of firearms by

10

felons, § 922(g)(1), as "presumptively lawful," and that § 922(g)(9) had been enacted to close the "dangerous loophole" that placed many violent domestic abusers outside the scope of § 922(g)(1) because they were never charged with or convicted of felonies.  Id. at 1205.  We noted that § 922(g)(9) was also narrower than § 922(g)(1), as it required a predicate act of violence for a conviction, whereas "an armed robber and [a] tax evader" were treated equally under § 922(g)(1).  Id. at 1206.  Thus, by analogy, we saw "no reason to exclude § 922(g)(9) from the list of longstanding prohibitions on which Heller does not cast doubt."  Id.  Three months after White, we considered a challenge to § 922(g)(1) itself in United States v. Rozier, 598 F.3d 768 (11th Cir. 2010) (per curiam).  We again relied on Heller's self-limiting dictum that it should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons," 554 U.S. at 626, and upheld the law.  See Rozier, 598 F.3d at 770-71.

Finally, in GeorgiaCarry.Org I, we upheld a Georgia law barring the unrestricted carrying of firearms in eight specific locations, including "place[s] of worship."  687 F.3d at 1248-49.  For the first time we joined our sister circuits in extrapolating from Heller and McDonald a two-step inquiry for evaluating Second Amendment claims: "first, we ask if the restricted activity is protected by the Second Amendment in the first place; and then, if necessary, we . . . apply the appropriate level of scrutiny."  Id. at 1260 n.34.  We resolved the case at the first

step.  In applying that step, we followed <u>Heller</u>'s "command[]" to consider "the historical background of the Second Amendment." <u>Id.</u> at 1261.  We surveyed nineteenth century property law, tort law, and criminal law and concluded that "the pre-existing right codified in the Second Amendment does not include protection for a right to carry a firearm in a place of worship against the owner's wishes." <u>Id.</u> at 1264.  Specifically, we reasoned that one common application of Georgia's statute would be to vindicate the private owner of a place of worship who did not want a visitor to bring a firearm on to his property.  We held that any Second Amendment right "must be limited by the equally fundamental right of a private property owner to exercise exclusive dominion and control over its land." <u>Id.</u> at 1265.  The plaintiffs had brought a facial challenge, <u>id.</u> at 1260, and because "[o]ne common application of the [statute] would be when [an individual] wants to carry a firearm in a place of worship where management of the place of worship prohibits carrying," <u>id.</u> at 1261, the facial challenge failed.

      None of these cases is dispositive of the issue before us today, but they provide the necessary background for our decision.

                                    B.

      In evaluating a Second Amendment claim like the one before us, we would typically engage in the two-step analysis adopted in <u>GeorgiaCarry.Org I</u>: (1) Is the restricted activity protected by the Second Amendment in the first place? (2) If so,

                                    12

does it pass muster under the appropriate level of scrutiny?  But in the case before us, we need not venture down that road for two reasons.  First, the plaintiffs have raised only a single argument that fails on its own terms, contending that the burden on their constitutional right is so severe that no scrutiny analysis is necessary.  Second, the case reaches us on a scant preliminary injunction record, and we lack the factual context needed to answer a variety of questions critical to the constitutional inquiry.  We have no reason to and we do not today address whether the Corps' firearms regulation would pass muster under any form of elevated scrutiny.  Therefore, we uphold the district court's denial of the plaintiffs' motion for a preliminary injunction and return the matter to the district court for further factual development and consideration of the plaintiffs' request for a permanent injunction and declaratory relief.

1.

The plaintiffs in this appeal swing for the fences.  Before this Court they advance only one constitutional argument: that the Corps' firearms regulation is "unconstitutional <u>per se</u>" because it "destroys the Second Amendment right altogether on Corps property."  The plaintiffs contend that, as in <u>Heller</u>, the regulation in this case is so destructive of the right to bear arms that no scrutiny analysis is required.

13

In making this argument, the plaintiffs lean heavily on a recent decision of the Ninth Circuit, Peruta v. County of San Diego, 742 F.3d 1144 (9th Cir. 2014), reh'g en banc granted, 781 F.3d 1106 (9th Cir. 2015).  In that case, the court considered a challenge to San Diego County's concealed-carry license regime, in which an individual's "concern for [his own] personal safety alone [was] not considered good cause" sufficient to obtain a license to carry a firearm outside the home, unless the individual could "document specific threats against [him]."  742 F.3d at 1148 (internal quotation marks omitted).  After extensive textual and historical analysis, a divided panel concluded that "the right to bear arms includes the right to carry an operable firearm outside the home for the lawful purpose of self-defense."  Id. at 1166.  The San Diego County policy, the court found, prevented "the typical responsible, law-abiding citizen" from exercising that right, because the only way such a citizen could carry a weapon in public for self-defense was with a concealed-carry permit,[4] and merely fearing for one's public safety could not establish the "good cause" required to obtain a permit.  See id. at 1169. Thus, the court concluded that the permitting scheme was "the rare law that 'destroys' the [Second Amendment] right" altogether, thereby obviating any need for scrutiny analysis and "requiring Heller-style per se invalidation."  Id. at 1170.

---

[4] California law prohibits the open carriage of firearms, so concealed carry was the only lawful option for a citizen wishing to carry a gun in public.  See Peruta, 742 F.3d at 1172 (citing Cal. Penal Code § 26350).

14

The plaintiffs in this case claim that the same analysis applies. They argue that because the Corps' regulation permits only unloaded firearms and prohibits ammunition, their right to bear arms in self-defense at Allatoona has been completely destroyed, and thus the regulation "cannot be upheld under any [constitutional] standard." This argument carried the day in the District of Idaho, where the court relied on Peruta in permanently enjoining the Corps from enforcing its firearms regulation in Idaho. See Morris v. U.S. Army Corps of Eng'rs, No. 3:13-CV-00336-BLW, 2014 WL 5177343 (D. Idaho Oct. 13, 2014), appeal filed sub. nom. Nesbitt v. U.S. Army Corps of Eng'rs, No. 14-36049 (9th Cir. Dec. 10, 2014).

Before this Court, however, the plaintiffs strike out. Of course, we are in no way bound (as the Idaho district court was) by Peruta,[5] and we need not take a stand on Peruta's persuasiveness because, even accepting that the right to bear arms extends outside the home, the plaintiffs' argument fails on its own terms.

Peruta and Heller -- the cases the plaintiffs rely on in which the Second Amendment right was "destroyed" -- involved vastly broader firearms regulations than the restriction at issue here. The law in Heller "totally ban[ned] handgun possession in the home" throughout the District of Columbia, 554 U.S. at 628, while the policy in Peruta generally banned the carriage of firearms everywhere

---

[5] Incidentally, Peruta is no longer binding law even in the Ninth Circuit now that en banc review has been granted. See 781 F.3d at 1106.

outside the home throughout San Diego County, see 742 F.3d at 1170.  The Corps'

firearms regulation, in sharp contrast, applies only to Corps property: it is narrowly

cabined to a specific area, and in this case that area is specifically designated for

recreation.  The plaintiffs can freely exercise their right to bear arms for self-

defense elsewhere, whether in the home or on the streets, without running afoul of

this regulation.  Cf. Moore v. Madigan, 702 F.3d 933, 940 (7th Cir. 2012) ("A

blanket prohibition on carrying gun[s] in public prevents a person from defending

himself anywhere except inside his home . . . .  In contrast, when a state bans guns

merely in particular places . . . a person can preserve an undiminished right of self-

defense by not entering those places . . . .").  And as the district court noted, the

plaintiffs' presence at Allatoona was voluntary -- they did not "need to use [the

Allatoona campgrounds] on a regular basis."  GeorgiaCarry.Org II, 38 F. Supp. 3d

at 1377.  Other areas for camping and recreation are available to the plaintiffs

where their Second Amendment rights would be undisturbed by 36 C.F.R. §

327.13, including national parks[6] and Georgia state parks.[7]  The limited scope of

---

[6] Although firearms were once restricted in national parks, see United States v. Masciandaro, 638
F.3d 458, 467 (4th Cir. 2011) (upholding a federal regulation that prohibited carrying a loaded
weapon in a motor vehicle within national parks), as of 2010 visitors are permitted to possess
firearms in national parks to whatever extent they are allowed under state law.  See Credit Card
Accountability Responsibility and Disclosure Act of 2009, Pub. L. No. 111-24, § 512(b), 123
Stat. 1734, 1765 (2009) ("The Secretary of the Interior shall not promulgate or enforce any
regulation that prohibits an individual from possessing a firearm . . . in any unit of the National
Park System . . . if . . . the individual is not otherwise prohibited by law from possessing the
firearm; and . . . the possession of the firearm is in compliance with the law of the State in which

16

the regulation provides a powerful distinction from the cases on which the plaintiffs rely; so narrow a restriction on so limited a geographic expanse cannot fairly be said to destroy the plaintiffs' Second Amendment rights altogether.  The Corps' firearms regulation does not reach nearly as far as the regulations at issue in <u>Heller</u> or <u>Peruta</u>, and the plaintiffs cannot prevail simply by arguing that this case must reach the same result.[8]  This regulation does not gut the plaintiffs' general right to keep and bear arms in self-defense.

The plaintiffs advance only a single, all-or-nothing argument -- as their counsel conceded at the lectern.  Thus, the only question squarely before us is whether the plaintiffs demonstrated a substantial likelihood of success on the merits under this theory.  They did not.

2.

---

the unit of the National Park System . . . is located.").

[7] <u>See</u> Ga. Code Ann. § 12-3-10(o)(3) (West 2015) ("It shall be unlawful for any person to use or possess in any park, historic site, or recreational area any handgun without a valid weapons carry license issued pursuant to Code Section 16-11-129."); Ga. Dep't of Natural Res., <u>Park Rules and Regulations</u>, State Parks and Historic Sites, http://gastateparks.Org/rules (last visited June 1, 2015) ("A person possessing a valid weapon-carry license to carry a firearm valid in this state may carry such firearm on Georgia State Parks and Historic Sites . . . .").

[8] The cases the plaintiffs cite from the District Court for the District of Columbia, <u>Palmer v. District of Columbia</u>, 59 F. Supp. 3d 173 (D.D.C. 2014), and <u>Wrenn v. District of Columbia</u>, No. 1:15-cv-162-FJS, 2015 WL 3477748 (D.D.C. May 18, 2015), are similarly distinguishable.  Each relied extensively on <u>Peruta</u> and each involved licensing regimes that regulated the carrying of handguns <u>throughout</u> the District, not cabined to specific recreational areas.

Having addressed the plaintiff's sole contention, we are not called upon to engage in a full constitutional scrutiny analysis -- nor should we do so on the basis of so limited a factual record and narrow argumentation. The district court performed a full constitutional analysis on the basis of a scant preliminary injunction record. After discovery, it will have an opportunity to reconsider its analysis against a fuller factual background and better developed arguments.

First, although our caselaw instructs that we must look to history in evaluating a Second Amendment claim, none of the parties before this Court have provided any historical evidence to inform our analysis. <u>Heller</u> held that the Second Amendment "codified a pre-existing right," so the courts must consider the Amendment's historical background to understand its content. 554 U.S. at 592 (emphasis omitted); <u>see</u> <u>GeorgiaCarry.Org I</u>, 687 F.3d at 1261 ("<u>Heller</u> commands that, in passing on a Second Amendment claim, courts must read the challenged statute in light of the historical background of the Second Amendment."). Moreover, <u>Heller</u> described the types of regulations on which it did not "cast doubt" as "longstanding." 554 U.S. at 626-27. This has led some courts to consider the historical pedigree of challenged regulations in conducting a Second Amendment analysis. <u>See, e.g.</u>, <u>Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives</u>, 700 F.3d 185, 196-97 (5th Cir. 2012); <u>Heller II</u>, 670 F.3d at 1253-55.

The district court made an admirable effort to undertake this historical inquiry on an accelerated preliminary injunction timeline.  As it noted, the Corps has existed in some form as part of the Army since the Revolutionary War, and was formally established in 1802.  See GeorgiaCarry.Org II, 38 F. Supp. 3d at 1371-72 (citing U.S. Army Corps of Eng'rs Office of History, The U.S. Army Corps of Engineers: A History 1, 8 (2008), http://www.publications.usace.army.mil/Portals/76/Publications/EngineerPamphlets/EP_870-1-68.pdf [hereinafter Army Corps History]).  In its early days, the Corps was primarily concerned with constructing fortifications for defense purposes, but slowly began to take on additional civil responsibilities, including surveying, exploring, and cartography.  See Army Corps History at 11-12, 22.  From our research, it appears that the Corps began managing recreational areas in 1944.  See Act of Dec. 22, 1944, Pub. L. No. 78-534, 58 Stat. 887, 889 ("The Chief of Engineers, under the supervision of the Secretary of War, is authorized to construct, maintain, and operate public park and recreational facilities in reservoir areas under the control of the War Department . . . .").  The first Corps firearms restrictions appear to have been enacted in 1946.  11 Fed. Reg. 9278, 9279 § 301.8 (Aug. 22, 1946) ("Firearms and explosives.  Loaded rifles, loaded pistols, and explosives are prohibited in the reservoir area.").  Meanwhile, the first federal firearms restrictions for national parks -- similar federally managed recreational

19

sites -- seem to have been established in 1936, and to have appeared in the first

edition of the Code of Federal Regulations at 36 C.F.R. § 2.9 in 1938.  See 1 Fed.

Reg. 672, 674 (June 27, 1936) ("Firearms, explosives, traps, seines, and nets are

prohibited within the parks and monuments, except upon written permission of the

superintendent or custodian.").  But without any guidance from the parties, we

have not had the opportunity for a thorough historical survey, and we are reluctant

now to perform the historical analysis our caselaw requires.  These are difficult

questions that deserve the full benefit of our adversarial system.

Second, the preliminary injunction record does a limited job fleshing out a

variety of factual issues that may bear upon a Second Amendment analysis.  Thus,

for example, as to the issue of whether the Corps property constitutes what Heller

called a "sensitive place," we are missing basic information.  Among others, we do

not know the size of the Allatoona Dam, a major feature of the water resource

development project and (all parties agree) a potential national security concern.

Nor do we know the size of the recreational area at issue in this case -- that is,

where the plaintiffs seek to carry their weapons in this as-applied challenge.

Moreover, we have no way of telling how far the recreational area extends beyond

the dam, whether the recreational area is separated from the dam itself by a fence

or perimeter, or to what extent the dam is policed.  All this preliminary injunction

record reveals is that the dam itself is a national security concern and that the

federal government (through the Corps) has opened a large parcel of nearby land
for recreation.

Moreover, <u>any</u> constitutional elevated scrutiny analysis -- strict or
intermediate -- would require us to consider the fit between the challenged
regulation and its purpose.  <u>See, e.g.</u>, <u>Tyler v. Hillsdale Cnty. Sheriff's Dep't</u>, 775
F.3d 308, 330 (6th Cir. 2014) (articulating strict scrutiny in the Second
Amendment context as asking whether the government regulation "furthers a
compelling interest and is narrowly tailored to achieve that interest" (quoting
<u>Citizens United v. Fed. Election Comm'n</u>, 558 U.S. 310, 340 (2010))), <u>reh'g en
banc granted & opinion vacated</u>, No. 13-1876 (6th Cir. Apr. 21, 2015); <u>Heller II</u>,
670 F.3d at 1258 (articulating intermediate scrutiny in the Second Amendment
context as asking whether the government regulation is "substantially related to an
important governmental objective" (quoting <u>Clark v. Jeter</u>, 486 U.S. 456, 461
(1988))); <u>cf.</u> <u>Eng'g Contractors Ass'n of S. Fla. v. Metro. Dade Cnty.</u>, 122 F.3d
895, 906-07 (11th Cir. 1997) (articulating the same strict and intermediate scrutiny
standards in the equal protection context).

In this case, the government's stated and plainly legitimate objective is
promoting public safety on Corps property.  But we lack much of the basic
information we would need to assess the risks found at Allatoona Lake.  For
example, we do not know how heavily trafficked the relevant area is at various

times of the year,[9] nor what types of activities the visitors engage in, nor how the

visitors are distributed throughout the property.  All we have before us is an

affidavit from a single Corps Park Ranger that speaks in generalities about the

presence of visitors and their potential sources of conflict.  We also have no

evidence about the dangers currently facing Allatoona visitors, including the

frequency and nature of crimes committed or of altercations amongst visitors.  And

although we are told that the Corps has the authority to coordinate with local law

enforcement to provide additional patrols during peak visitation periods, we do not

know whether the Mobile District of the Corps has done so.  In fact, other than a

description of the general law enforcement limitations of Corps Park Rangers, we

know almost nothing about the nature of the police presence at Allatoona Lake.  In

sum, we do not have before us any empirical data that might aid in assessing the fit

between the challenged regulation and the government's asserted objective.  This

slim preliminary injunction record does not provide nearly enough information to

enable a court to fairly engage in a thorough constitutional analysis.

    With a fuller record and more thorough briefing, the district court will have

the opportunity again to engage in a complete constitutional analysis.  We hold

today only that the district court did not abuse its discretion in denying the

---

[9] The plaintiffs asserted in their complaint that Allatoona Lake receives "over [six] million
visitors per year," a figure the district court repeated and that the government assumed to be true
for purposes of its motion in opposition.  Even assuming that number is correct, we still do not
know how many visitors, on average, are present at Allatoona Lake at any given time of the year.

plaintiffs' request for a preliminary injunction on the basis of this limited record and in the face of the plaintiffs' sweeping argument that the Corps' firearms regulation was "per se unconstitutional" because it "destroy[ed] . . . altogether" their Second Amendment right to keep and bear arms.  We offer no opinion about the ultimate disposition of this case -- whether the plaintiffs are entitled to a permanent injunction barring the enforcement of 36 C.F.R. § 327.13 or to declaratory relief.

Because the plaintiffs have not shown a substantial likelihood of success on the merits, we need not consider the remaining factors in the preliminary injunction test.  See ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd., 557 F.3d 1177, 1198 (11th Cir. 2009) ("Failure to show any of the four factors is fatal, and the most common failure is not showing a substantial likelihood of success on the merits.")

Accordingly, we AFFIRM.